Michael Bonazza
mike.bonazza@gmail.com
2092 Kuhio Avenue, Apt. 2402
Honolulu, Hawaii 96815
Plaintiff, *Pro Se*

Benjamin L. Webster, Bar No. 132230
bwebster@littler.com
Nathaniel H. Jenkins, Bar No. 312067
njenkins@littler.com
Lauren J. Orozco, Bar No. 332880
lorozco@littler.com
LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
Telephone: 916.830.7200
Fax No.: 916.561.0828

Attorneys for Defendant
MUFG UNION BANK

**FILED**

AUG 07 2023

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL BONAZZA,<br><br>        Plaintiff,<br><br>v.<br><br>MUFG UNION BANK,<br><br>        Defendant. | Case No. 23-CV-01161-JCS<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT AND RULE 26(f) REPORT**<br><br>Date: September 15, 2023<br>Time: 2:00 p.m.<br>Courtroom: D - 15th Floor<br><br>Trial Date: Not Yet Set<br>Complaint Filed: February 23, 2023 |

Pursuant to Federal Rule of Civil Procedure 26(f), Civil Local Rule 16-9, and the Standing Order for All Judges of the Northern District of California, planning conference discussions were held by telephone on July 25, 2023, between Plaintiff Mike Bonazza ("Plaintiff"), in *pro se*, and Nate Jenkins of Littler Mendelson, P.C., counsel for Defendant MUFG Union Bank, N.A. ("Defendant").

1. **JURISDICTION AND SERVICE**

The Court has original jurisdiction over this action pursuant to 28 USC 1331 and the existence of a federal question. Here, whether Defendant violated Title VII of the Civil Rights Act.

2. **FACTS**

   A. **Plaintiff's Description of the Case**
   POSITIONS

1. The 2022 term in Plaintiff's contract operated in practice to freeze the practice of hiring a disproportionate number of white males compared to women/minorities despite neutral intent compared with a group of 9 other employees.

2. Plaintiff's primary rebuttal to MUFG's showing of business necessity is that MUFG could have implemented a less discriminatory path by hiring Plaintiff in a permanent capacity within the CTS group (Computer Technology Services), 1) when considering Plaintiff's professional experience, 2) assuming CTS had a workflow automation component, and 3) hiring Plaintiff would have in part corrected the statistical imbalance between Plaintiff and women/minorities who share a similar business profile from 2013-2017 and were contractually on a level playing field as of 2022.

3. As a second rebuttal, Plaintiff contends the amount of money he was paid in combination with what the bank paid KPMG to consult on the subject of accounting modernization over Plaintiff's contract was already a full year of salary (approx 30,000 x 4 staff) and there was no indication the bank was going to stop that arrangement, which would indicate business necessity/priority. If you continued for even three more months to implement automation solutions with four staff, that is already $240,000 in salary over 6 months with the potential for ongoing business – and even the potential to keep KPMG engaged. Perhaps that was the three-person team

that was talked about at the time. As an aside, Plaintiff's understanding is that the three person KPMG team was all non-white male.

4. As a third rebuttal, Plaintiff contends there was business mention (not yet determined officially by the organization) between Plaintiff and manager at the time of Plaintiff's 2022 contract about building out a small team (2-3 employees) to aide in accounting modernization efforts. Plaintiff will attempt to obtain from the Defendant a written testimony for the Court.

5. Employees who were peers to Plaintiff between 2013-2017 (and as of 2022) share the same management team and business profile assuming a contractually level playing field because of the option for permanent placement in Plaintiff's contract.

6. Business profile is not a protected characteristic, but serves as a mechanism to show commonality with employees he was a peer to previously at MUFG under the same business conditions between 2013-2017 and who share the same management team, which affected both those individuals between 2017-2022 and Plaintiff in 2022 when he was interviewed for a role in CTS.

7. Regarding Defendants position that Plaintiff 'voluntarily resigned twice', the circumstances in 2022 were different than the circumstances in 2017 due to Plaintiff's business profile through ten years and a term included in Plaintiff's contract. Voluntarily signing up to be laid off in two years is the same thing as losing your job today. Either way, Plaintiff did not/would not have enjoyed the same employment opportunity relative to protected peers. Plaintiff maintains that if Plaintiff can prove a statistically significant economic disparity relative to peers in protected demographics and if Plaintiff can demonstrate business necessity that would indicate there was a less discriminatory path for the bank to take, it would be reasonable for Plaintiff to win the case based on precedent.

## STATISTICAL SIGNIFICANCE

1. Assuming ten total outcomes, if you place nine employees permanently and one employee in a termed contract, and if the permanently placed employees are in a protected class vs the one employee who is not, the chances of the permanently placed employees being part of a protected class is 88% vs an unprotected class at 12% (CTS/Controllers/Treasury).

2. The magnitude of comparing 10 employees, or even 5 employees, is notable when comparing permanently placed employees who have at or over 10 ten years of total experience as of 2022.

## CASE DETAILS

1. The termed nature of Plaintiff's contract led to a statistically significant pay disparity relative to women and minorities who worked at MUFG during the same time BECAUSE

- Two white male colleagues whom Plaintiff worked with between 2013 and 2017 crossed the 40 (year old) line before Plaintiff's employment. Due to the age difference as of Plaintiff's contract (June 2022), these individuals are not comparable peers.
- The provision for permanent placement in Plaintiff's 2022 contract leveled the playing field because both his prior experience, including at MUFG, and ambiguous 2022 contract, made it reasonable to believe Plaintiff could have been permanently placed alongside other permanently placed (under 40) employees in Controllers, CTS or Treasury.
- If Plaintiff were to become permanent in 2022, he would have been comparable to employees hired between 2013-2017 based on his 2013-2017 business profile, assuming the playing field was contractually level with 2013-2017 employees in 2022 due to the provision in Plaintiff's 2022 contract to be permanently placed.
- ~~Plaintiff does not share prior, permanent experience with MUFG employees hired between 2017-2022/Plaintiff contends that the subsequent hiring~~. The term in Plaintiff's 2022 contract operated to 'freeze' the status quo among employees he did share comparable, permanent MUFG

experience with between 2013 and 2017 despite neutral intent and despite the playing field being level due to the provision for permanent placement in Plaintiff's contract.

### B. Defendant's Description of the Case

Defendant denies liability for all claims, and maintains that it all times complied with federal and state employment laws. Namely, Plaintiff voluntarily resigned (twice) form his employment with Defendant and otherwise never suffered any sort of the requisite adverse employment action necessary to establish a claim under Title VII.

### 3. LEGAL ISSUES

Plaintiff's Position:

1. The Complaint asserts claims of employment discrimination under Title VII of the Civil Rights Act of 1964 based on a failure to hire.

2. The Supreme Court explained in Griggs, 401 U.S. at 429–30, that under Title VII, which was enacted at the same time as Title VI, "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." Id. at 430;

a. Accordingly, Watson and Wards Cove show that the Supreme Court now expects a plaintiff to show impact from specific employment practices. Arguably, this demonstration of impact is the same as proving intent: the plaintiff's disparate impact prima facie case will now be based exclusively on his proof of discrimination derived from a specific practice, which has its genesis in the employer's intent. Anything less than proof of discriminatory intent would amount to coincidence.

b. Beyond the now near-impossible requirement of statistical correlation, the Supreme Court also requires that a plaintiff rebut the employer's showing of business necessity by proving that the employer could have implemented a less discriminatory alterna tive;300 thus, a rigorous task. Therefore, even if the plaintiff establishes a prima facie case with the added restrictions on his

statistical evidence of disparity, he or she now has the additional burden of proving a second case.30 ' To be successful, the plaintiff, under Wards Cove, must discover and bring additional evidence of such an alternative.

    c. Notwithstanding, content validation is the most reconcilable means of validating a test, whether it be subjective or objective criteria to the intent of Congress in enacting Title VII and the Griggs disparate impact model.3 0 ' <u>The employer who validates his test with this means is testing the applicant by examining his or her actual skills and knowledge which will be required for successful job performance -</u> not by looking at the applicant "in the abstract," as prohibited by Griggs.3 °5 This validation is most useful for a court hearing a disparate impact claim of the kind set out by the Burger majority in Griggs. Certainly courts will not require anything more. Anything less will facilitate the evaporization of the disparate impact test - the apparent thrust of the Rehnquist Court in Watson and Wards Cove.

    3. Civil Rights Act of 1991 – Congress believed that the Wards Cove case made it too difficult to prove disparate impact claims under Title VII. While the amended Act still generally requires that a plaintiff identify particular employment practice(s) allegedly causing a disparate impact, Congress added that an employer's decisionmaking process may be analyzed as a whole if the plaintiff can show that "the elements of [an employer's] decisionmaking process are not capable of separation for analysis." <u>Congress also established that the employer has the burden of proof on the business necessity defense and restored the meaning of "business necessity" to how it was interpreted before Wards Cove.</u> Congress did not, however, alter the portion of Wards Cove describing the plaintiff's burden with respect to statistical proof, in which the court had held: "The mere existence of a statistical imbalance in an employer's workforce on account of race, color, religion, sex, or national origin is not alone sufficient to establish a prima facie case of disparate impact violation."

Plaintiff contends that placing him in a permanent capacity within the CTS/Controller/or Treasury team would have been a less discriminatory alternative to termed employment in a consulting capacity, particularly because of (1) MUFG's interest in accounting modernization, (2) the connection between Plaintiff's automation experience prior to MUFG employment and to the team he was interviewed for (CTS) and (3) because Plaintiff's class had a disproportionate number of permanently placed (without term) white males compared with women and minorities who have 6-10 years of experience and share prior permanent MUFG experience under the same management team. That is a ratio of 9-1 or approx 88% to 12%. Assuming the provision for permanent placement put Plaintiff on a level playing field with those employees.

Defendant's Position:

Defendant denies liability for all claims, and maintains that it all times complied with federal and state employment laws. Namely, Plaintiff voluntarily resigned (twice) from his employment with Defendant and otherwise never suffered any sort of the requisite adverse employment action necessary to establish a claim under Title VII.

## 4. MOTIONS

Pending Motions. There are no pending motions.

Discovery Motions. The parties anticipate the use of discovery motions only as necessary to obtain responsive discovery.

Pre-Trial/Dispositive Motions. Defendant intends to file a motion for summary judgment after the completion of discovery.

### 5. AMENDMENT OF PLEADINGS

Plaintiff does not currently intend to amend his complaint or add parties, as this was already addressed with the Court at the prior Case Management Conference on June 23, 2023.

### 6. EVIDENCE PRESERVATION

The Parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI Guidelines"). The Parties further confirm that they have undertaken steps to preserve evidence relevant to the issues reasonably evident in this action.

### 7. DISCLOSURES

The Parties agreed to exchange initial disclosures on August 23, 2023.

### 8. DISCOVERY

Plaintiff's position:

1. <u>To the extent discovery calls for the production of confidential and/or proprietary documents, Defendant proposes that the Parties meet and confer and submit a stipulation and proposed protective order for the Court's review.</u>

2. <u>Rule 34 -</u> Plaintiff is requesting written discovery confirming discussion between manager (Erin Dickey) and Plaintiff regarding of a 3-person team to aide in accounting modernization.

3. <u>Rule 34 -</u> Plaintiff is requesting a list of employees (and their demographic traits) who Plaintiff considers a peer both in 2013-2017 and contractually in 2022, permanently placed and under 40. Including, but not limited to the list of individuals Plaintiff sent to Littler as part of document request 14,15.

4. <u>Rule 34 -</u> Plaintiff is requesting the calendar invite and recorded phone call of when an associate from Jerry Migliaccio's team introduced desktop automation to the larger group during Plaintiff's contract.

5. <u>Rule 34 -</u> Plaintiff is requesting email sent from Chris Escher to the organization regarding the launch of automation in March 2022

6. <u>Rule 34 -</u> Plaintiff is requesting written discovery confirming when the Loss Share Portfolio was wound down/offshored and when Jeff Wallace transferred from his Loss Share position to VP of Special projects. Also confirming the nature of job responsibilities that were transferred between Amy Anderson and Vincent Cordera during 2017-2018. Also confirming the nature of Plaintiff's work on the credit card portfolio (immediately after acquisition).

7. <u>Rule 34 -</u> Plaintiff is requesting his prior MUFG contract from 2013-2017 if the Court deems it necessary

8. <u>Rule 34 -</u> Plaintiff is requesting a 'demographic rollforward' for completeness and to illustrate employee changes/makeup between and at 2017-2022 to illustrate the overall direction the company is moving in regarding employee demographics. As well as the employee list/traits, <u>including the team they are a part of (Treasury/CTS/Controllers)</u> which make up the rollforward.

9. <u>Rule 34 –</u> Plaintiff is requesting a written statement from management discussing how much KPMG was paid to consult on the subject of accounting modernization during Plaintiff's

1. contract, and whether/how long/how many KPMG or other employees worked on workflow automation for the Reporting Center of Excellence team after Plaintiff's 2022 contract (or how those positions transitioned to the broader bank).

10. <u>Rule 34</u> – Plaintiff is requesting a written statement from management confirming that Plaintiff worked to demonstrate the full range of office 365 capabilities to the consultant from Protiviti (working for Steve Tubbs), to the management team, to KPMG and to acquired loans, which includes a request for any emails or recorded phone calls from the bank that pertain to these matters.

Defendant's position:

Defendant agrees to meet and confer and work cooperatively on the scope of discovery and any issues that arise, including with respect to electronically stored information. To the extent discovery calls for the production of confidential and/or proprietary documents, Defendant proposes that the Parties meet and confer and submit a stipulation and proposed protective order for the Court's review.

Defendant intends to serve written discovery on Plaintiff seeking documents in Plaintiff's position that he believes prove his claims, as well interrogatories seeking to understand the facts that Plaintiff believes exists that support his claims.

Following written discovery, Defendant intends to the take the deposition of Plaintiff regarding the claims at issue in the Complaint and Defendant's defenses thereto.

Finally, Defendant anticipates the need to call expert witnesses at the time of trial in this matter and proposes that the Parties follow the timing for disclosure of expert witnesses and information under Rule 26(a)(2).

**9. CLASS ACTIONS**

This is not a Class Action case.

**10.    RELATED CASES**

The Parties are unaware of any related cases.

**11.    RELIEF**

Plaintiff's position: Plaintiff is requesting front and back pay (from the date of his last day of 2022 employment) in the amount of his contractual pay (106,000) per year based on his age (35 at the time) up to 3 million dollars based again on the fact that Plaintiff received a limited, termed contract versus comparable peers. Plaintiff will potentially ask for a higher settlement because the case has gone past ADR.

Defendant's position:

Defendant denies that Plaintiff is eligible for any relief.

**12. SETTLEMENT AND ADR**

The parties have complied with ADR Local Rule 3-5 and have filed the required ADR certification documents.

**13. OTHER REFERENCES**

This case is not suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

**14. NARROWING OF ISSUES**

The Parties are not aware of issues that can be narrowed by agreement at this time.

**15. EXPEDITED TRIAL PROCEDURE**

The Parties agree that this is not the type of case to be handled under the Expedited Trial Procedure of General Order No. 64 Attachment A. - Parties have not yet articulated why an expedited trial is not suitable for this case

**16. SCHEDULING**

| Proposed Event | Proposed Dates |
|---|---|
| Fact Discovery Cutoff, including hearings on discovery motions | April 15, 2024 – Plaintiff is not in agreement with the drawn-out timeline |
| Expert Discovery Cutoff, including hearings on discovery motions | June 14, 2024 – Plaintiff is not in agreement with the drawn-out timeline |
| Last Day to File Dispositive Motions | June 14, 2024 - – Plaintiff is not in agreement with the drawn-out timeline |

| Last Hearing Date for Dispositive Motions | July 19, 2024 - – Plaintiff is not in agreement with the drawn-out timeline |
|---|---|
| Pretrial Conference | TBD – Plaintiff doesn't agree with the opinion it is too early to set a trial date |
| Trial | TBD - – Plaintiff doesn't agree with the opinion it is too early to set a trial date |

## 17. TRIAL

This case will be tried before a jury and will likely last 5 days. Defendant contends it is too early to set a trial date, and requests the Court wait until after ruling on dispositive motions to set a trial date. - Plaintiff is not in agreement with a Jury trial and would prefer a bench trial due to specialized nature of the case. In particular because this case will likely require an understanding of constitutional precedent. PLAINTIFF NOTES THE FOLLOWING FEATURE FROM THE 1991 ACT: **The Act also authorized jury trials on Title VII claims and allowed Title VII plaintiffs to recover emotional distress and punitive damages, <u>while imposing caps on such relief</u>.**

## 18. DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS

Defendant filed a Certification of Interested Entities or Persons on July __, 2023. Other than the named parties, there are no additional interested parties or entities.

## 20. PROFESSIONAL CONDUCT

The attorneys of record for the parties certify that they have reviewed the Guidelines for Professional Conduct for the Northern District of California.

## 21. SUCH OTHER MATTERS AS MAY FACILITATE THE JUST, SPEEDY, AND INEXPENSIVE DISPOSITION OF THIS MATTER

The Parties are not aware of other matters that may facilitate the just, speedy and inexpensive disposition of this matter.

Dated: July __25__, 2023

*Mike B.* (signature)

Michael Bonazza
Plaintiff, *Pro Se*

JOINT SCHEDULING REPORT AND
RULE 26(f) DISCOVERY PLAN        11.        CASE NO. 23-CV-01161-JCS

Dated: July ___, 2023

_____
Benjamin L. Webster
Nathaniel H. Jenkins
Lauren J. Orozco
LITTLER MENDELSON, P.C.
Attorneys for Defendant
MUFG UNION BANK

4864-4312-3051.1 / 063093-1086